Petition granted.

**IN RE Petition for DISCIPLINARY ACTION AGAINST Geoffrey R. SALTZSTEIN, a Minnesota Attorney Registration No. 0390484**

A16-1308

Supreme Court of Minnesota.

Filed: June 21, 2017

Susan M. Humiston, Director, Binh T. Tuong, Assistant Director, Office of Lawyers Professional Responsibility, Saint Paul, Minnesota, for petitioner.

Geoffrey R. Saltzstein, Edina, Minnesota, pro se.

## OPINION

### PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action against respondent Geoffrey R. Saltzstein, alleging, in part, misappropriation of client funds, false statements, failure to diligently handle client matters, failure to adequately communicate with clients, failure to enter into proper fee agreements and communicate the basis of rates and fees, and noncooperation with the Director's investigations. After Saltzstein did not file an answer to the petition, we deemed the allegations of the petition admitted. The sole issue before us is the appropriate discipline. We conclude that the appropriate sanction is disbarment.

## FACTS

Respondent Geoffrey R. Saltzstein was admitted to the practice of law in Minnesota on October 30, 2009.[1] Saltzstein's misconduct involved his representation of six clients: C.W., P.A., N.K., M.O., R.R., and R.M.

### C.W. Matter

In November 2010, C.W. retained Saltzstein to defend him in a criminal matter. In December 2010, C.W. pleaded guilty and began to serve his 5-year prison sentence. Saltzstein agreed to hold money in his law firm's trust account that C.W. expected to receive from a settlement of an unrelated civil suit while C.W. was serving his sentence. C.W. gave Saltzstein the first of two installments from the settlement. By the summer of 2011, after a series of deductions that C.W. authorized, the trust account contained $28,663.58 of C.W.'s funds.

Pursuant to a power of attorney from C.W., Saltzstein placed $28,713.58 into a mutual-fund account in C.W.'s name.[2] When C.W. received his second settlement installment payment of $9,500, he instructed Saltzstein to place the money into the mutual-fund account. Saltzstein did so.

In 2011, C.W. agreed to pay Saltzstein $3,000 to review C.W.'s criminal case and $3,000 to file a motion to reopen the case. Saltzstein subsequently filed a motion to withdraw C.W.'s guilty plea on C.W.'s behalf. Saltzstein withdrew a total of $7,500 from C.W.'s mutual-fund account, $1,500 more than C.W. had agreed to pay in attorney fees.

In addition to the unauthorized withdrawal of an additional $1,500 for the motion to withdraw the guilty plea, Saltzstein

---

1. These facts are taken from the allegations in the petition for disciplinary action, which we have deemed admitted under Rule 13(b), Rules on Lawyers Professional Responsibility.

2. The record does not explain why the initial mutual-fund account balance was $50 greater than the amount of money that Saltzstein was holding in trust for C.W.

made a series of unauthorized withdrawals from C.W.'s mutual-fund account. Over the next year, Saltzstein withdrew nearly all of C.W.'s mutual-account funds without C.W.'s knowledge or permission, leaving the mutual-fund account with a balance of only $1.75 by March 2013.

Saltzstein made a series of false and misleading statements about C.W.'s mutual-fund account. In August 2014, C.W. requested an accounting of his mutual-fund account. Saltzstein responded that he had liquidated the account and that C.W. would receive the balance of the funds in 10 to 14 days. Saltzstein never provided an accounting. C.W.'s sister emailed Saltzstein, indicating that C.W. had never asked for a liquidation of the mutual-fund account, to which Saltzstein responded that he "was simply safeguarding [C.W.'s] money." In September 2014, when C.W. sought information about the deductions from his mutual-fund account, Saltzstein told C.W. that the liquidated funds were being redeposited and that the balance was about $16,000. In reality, there was no liquidation or funds redeposited, and there was only a balance of $1.75 in the account.

In October 2014, nearing the end of his sentence, C.W. needed money for housing upon leaving prison. Saltzstein told C.W. not to apply for emergency financial assistance, saying "you have the money." Saltzstein, however, had withdrawn almost all of the funds from C.W.'s mutual-fund account.

By November 2014, after C.W. had communicated with the named partner at the law firm where Saltzstein worked, Saltzstein made partial restitution, bringing the mutual-fund-account balance to $23,863, still short of the amount that he had improperly withdrawn.

Saltzstein's misconduct in his representation of C.W. included misappropriation of C.W.'s funds, failure to respond to C.W.'s requests for information, and making false statements to C.W. and his sister, in violation of Minn. R. Prof. Conduct 1.4(a)(4) (requiring a lawyer to "promptly comply with reasonable requests for information" from a client), 1.15(a) (requiring a lawyer to keep client funds in a trust), 1.15(c)(3) (requiring a lawyer to provide an accounting of client funds), 1.15(c)(4) (requiring a lawyer to promptly pay funds in the lawyer's possession that the client is entitled to receive when requested), 4.1 (prohibiting a lawyer from making a knowingly false statement during the course of representing a client), 8.4(c) (prohibiting "conduct involving dishonesty, fraud, deceit, or misrepresentation"), and 8.4(d) (prohibiting conduct "prejudicial to the administration of justice").

*P.A. Matter*

In March 2015, P.A. hired Saltzstein to represent him in a criminal appeal before the United States Court of Appeals for the Eleventh Circuit. Saltzstein agreed to accept P.A.'s vehicle, a 2008 Yukon, as payment. In accepting the Yukon, however, Saltzstein failed to advise P.A. on the desirability of seeking independent counsel for the transaction, to provide the time and opportunity for P.A. to seek such counsel, and to obtain informed consent to the transaction in a document other than the retainer agreement. Later, during the representation, Saltzstein failed to respond to P.A.'s request to provide copies of the retainer agreement.

In addition to entering into a transaction with his client, Saltzstein also missed filing deadlines while representing P.A. P.A.'s brief was initially due to the Eleventh Circuit on May 19, 2015. Throughout the month of May 2015, while incarcerated, P.A. attempted to contact Saltzstein to dis-

cuss his case. Saltzstein did not reply to these communications. The Eleventh Circuit granted Saltzstein two extensions of time to file his brief, moving the deadline to June 25, 2015. Saltzstein, however, never filed a brief. In August 2015, the Eleventh Circuit dismissed P.A.'s appeal. Saltzstein later sold the Yukon and retained the proceeds, despite failing to complete the work on P.A.'s appeal.

P.A. also hired Saltzstein to ensure that P.A. remained compliant with his court-ordered payments to his life-insurance policy while he was incarcerated. P.A. gave Saltzstein $38,635 to pay the premiums, but Saltzstein did not make the payments. The insurance company subsequently cancelled the policy. From June to August 2015, P.A. repeatedly contacted Saltzstein to get information about, and an accounting of, the premium payments on his life-insurance policy. Saltzstein never provided an accounting or responded to P.A.'s communications.

Saltzstein's misconduct in his representation of P.A. included misappropriating the funds set aside for P.A.'s life-insurance premiums, entering into a business transaction with P.A. without the requisite advice and disclosures, retaining the proceeds of the Yukon sale without providing the agreed-upon legal services, failing to diligently handle P.A.'s criminal appeal, and failing to adequately communicate with P.A., in violation of Minn. R. Prof. Conduct 1.3 (requiring a lawyer to "act with reasonable diligence"), 1.4(a)(4), 1.5(b)(3) (prohibiting nonrefundable fee agreements), 1.8(a) (governing business transactions with clients), 1.15(a), 1.15(c)(3), 1.15(c)(4), 1.16(d) (requiring reasonable steps to protect the client's interest upon termination of representation), 3.2 (requiring a lawyer to "expedite litigation"), 8.4(c), and 8.4(d).

### N.K. Matter

In July 2014, N.K. retained Saltzstein to represent him in a parole hearing. N.K. paid Saltzstein $10,000 pursuant to a written fee agreement, $500 of which represented a cost advance. Saltzstein did not deposit the cost advance into a trust account. Saltzstein represented N.K. at a hearing that month, during which N.K.'s parole was revoked. Saltzstein agreed to appeal the revocation "on [Saltzstein's] dollar." Over the next 2 months, Saltzstein assured N.K. that he was working on the appeal. After meeting with N.K. in prison to discuss the appeal in October 2014, however, Saltzstein never again worked on the appeal. As a result, N.K.'s appeal deadline passed without a filing. Saltzstein also did not respond to any of N.K.'s requests for communication, an accounting, or the return of N.K.'s client file.

Saltzstein's misconduct in his representation of N.K. included failure to enter into a proper fee agreement, failure to timely provide an accounting and return N.K.'s client file, failure to diligently handle N.K.'s appeal, and failure to adequately communicate with N.K., in violation of Minn. R. Prof. Conduct 1.3, 1.4(a)(3) and 1.4(a)(4), 1.5(b) (requiring a lawyer to communicate the basis of a fee to a client), 1.15(a), 1.16(d), and 8.4(d).

### M.O. Matter

In August 2014, M.O. retained Saltzstein to represent her in a criminal matter. On Saltzstein's recommendation, M.O. spent 57 days in an alcohol-rehabilitation facility. Saltzstein appeared in court with M.O. for hearings in October 2014, December 2014, and January 2015, after which M.O. left the country to study abroad. Saltzstein assured M.O. that he would continue working on her criminal case while she was

abroad. Saltzstein appeared in court for a March 2015 hearing, after which he indicated to M.O. that he was trying to "get a deal worked out." Later that month, however, Saltzstein failed to appear for a hearing in M.O.'s case, causing a warrant to be issued for M.O.'s arrest and the forfeiture of her bond. Saltzstein did not inform M.O. of these developments.

In April 2015, the bail agent emailed M.O. about "missing court." M.O. relayed the message to Saltzstein, who advised her not to "worry about it" because he was "working with the judge and prosecutor." M.O., however, received a charge on her credit card that month for the cost of the bond. Saltzstein did not respond to her inquiry about the charge.

In June 2015, M.O. contacted Saltzstein, saying that the rehabilitation facility that he had recommended personally charged her $30,000 after her insurance reached its maximum limit of coverage. Saltzstein said he would investigate the matter, but never did. Saltzstein also failed to respond to other communications from M.O., and he canceled multiple meetings that she requested to discuss her case.

Saltzstein's misconduct in his representation of M.O. included failing to diligently handle M.O.'s legal representation and failing to adequately communicate with M.O., in violation of Minn. R. Prof. Conduct 1.3, 1.4(a)(3) and 1.4(a)(4), 3.2, and 8.4(d).

*R.R. Matter*

In August 2013, R.R. retained Saltzstein to represent him in a criminal matter. R.R. paid the agreed-upon fixed fee of $10,000, plus a $100 cost advance. Saltzstein sent R.R. a retainer agreement, but neither R.R. nor Saltzstein signed the agreement. In February 2014, R.R. terminated the representation. R.R. requested a refund of $7,500. Saltzstein did not respond to the refund request. For the next 2 months, R.R. contacted Saltzstein by various means seeking an accounting and a refund. During that time, Saltzstein failed to respond to any of the communications, provide a refund, or furnish an accounting. In April 2014, Saltzstein finally provided an accounting, indicating that he had performed over $11,000 in legal services and that his firm had done more than enough work to justify the fee it had received. Saltzstein, however, had not completed all of the services required in the representation, and the cost advance was not listed in the accounting.

Saltzstein's misconduct in his representation of R.R. included failure to enter into a proper fee agreement with R.R., to timely provide an accounting, and to clearly communicate the basis and rate of his fees, in violation of Minn. R. Prof. Conduct 1.4 (requiring client communication), 1.5(b), 1.15(a), 1.15(c)(4), and 1.16(d).

*R.M. Matter*

In May 2014, R.M.'s parents retained Saltzstein to represent their son in a criminal matter with a bail hearing set for the next day. Saltzstein requested, and R.M.'s parents paid, $6,000 for the representation. Saltzstein did not place these funds in a trust account, and no fee agreement was signed. R.M.'s parents believed that, of the $6,000, $2,000 was allocated toward the fixed fee for the representation, and $4,000 was for R.M.'s bail. Saltzstein was under the impression that the entire $6,000 was a partial payment of the fixed fee. Saltzstein appeared with R.M. at the bail hearing, during which the court ordered R.M.'s release and set bail. The same day, R.M. posted bail, was released, and terminated Saltzstein's representation.

Saltzstein's misconduct in his representation of R.M. included failure to enter into

a proper fee agreement with R.M. and his parents and failure to communicate the basis and rate of his fees, in violation of Minn. R. Prof. Conduct 1.5(b) and 1.15(a).

*Director's Investigation*

Between May 2014 and November 2015, the Director received six complaints regarding Saltzstein's representation of the clients described above. Saltzstein provided a timely response to the notice of investigation for one complaint, untimely responses to the notices of investigation for two of the complaints, and no response at all to the notices of investigation for the three other complaints. Saltzstein also did not provide timely responses to the Director's requests for additional information regarding two of the complaints. From November 2015 through January 2016, the Director made at least four attempts to request information and responses from Saltzstein, none of which were successful. After February 2016, the Director received no more communications from Saltzstein regarding any of the pending complaints.

In June 2016, the Director served Saltzstein with charges of unprofessional conduct. Saltzstein did not file an answer to these charges. *See* Rule 9(a), Rules on Lawyers Professional Responsibility (RLPR) (requiring a lawyer charged with unprofessional conduct to submit an answer to the charges). Saltzstein's failure to cooperate with the Director's investigation of each of these complaints violated Minn. R. Prof. Conduct 8.1(b) (requiring responses to requests for information in disciplinary investigations) and Rule 25(a), RLPR (requiring cooperation in disciplinary investigations).

On August 4, 2016, the Director served Saltzstein with a petition for disciplinary action and later filed it with this court.

Saltzstein did not file an answer to the petition. *See* Rule 13(a), RLPR (requiring a lawyer served with a petition to file an answer). On December 2, 2016, we deemed the allegations in the petition admitted. *See* Rule 13(b), RLPR ("If the respondent fails to file an answer ... the petition's allegations shall be deemed admitted...."). We invited the parties to file briefs on the appropriate discipline. Only the Director filed a brief, which recommends disbarment.

## ANALYSIS

■■■■ Because the facts are undisputed, the only issue before us is the appropriate discipline. *See In re Swensen*, 743 N.W.2d 243, 246-47 (Minn. 2007). We have stated that the purpose of attorney discipline is not to punish the attorney, but instead is to protect the public, protect the judicial system, and deter future misconduct. *In re Rebeau*, 787 N.W.2d 168, 173 (Minn. 2010). Four factors guide our determination of the appropriate discipline: (1) the nature of the misconduct; (2) the cumulative weight of the rule violations; (3) the harm to the public; and (4) the harm to the legal profession. *In re Nelson*, 733 N.W.2d 458, 463 (Minn. 2007). We also consider mitigating or aggravating factors related to the misconduct. *In re Lundeen*, 811 N.W.2d 602, 608 (Minn. 2012). Finally, we look to cases involving similar misconduct in an effort to impose consistent discipline. *Id.*

■■■■ The nature of Saltzstein's misconduct is serious. Misappropriation alone is " 'particularly serious misconduct and usually warrants disbarment absent clear and convincing evidence of substantial mitigating factors.' " *In re Matson*, 889 N.W.2d 17, 23 (Minn. 2017) (quoting *In re Garcia*, 792 N.W.2d 434, 443 (Minn. 2010)).

"Misappropriation occurs whenever funds belonging to a client are not deposited in a trust account and are used for any purpose other than that specified by the client." *In re Westby*, 639 N.W.2d 358, 370 (Minn. 2002). Saltzstein misappropriated approximately $68,000 from two clients. Saltzstein misappropriated $29,445 from C.W. by making unauthorized withdrawals from C.W.'s mutual-fund account, and he misappropriated the $38,635 set aside for P.A.'s life-insurance premiums.[3] As explained below, no mitigating factors are present here.

Further, Saltzstein committed other serious misconduct. He engaged in a pattern of client neglect by failing to diligently pursue three client matters and failing to communicate with six clients. This misconduct led to the dismissal of an appeal in P.A.'s case, a missed deadline on an appeal in N.K.'s case, and the issuance of a warrant for M.O.'s arrest. *See In re Rhodes*, 740 N.W.2d 574, 578 (Minn. 2007) (stating that a " 'continuing pattern of client neglect is serious misconduct often warranting indefinite suspension by itself' . . . and that more 'extreme' cases involving client neglect and failure to communicate with clients may merit disbarment" (quoting *In re Brooks*, 696 N.W.2d 84, 88 (Minn. 2005); *In re De Rycke*, 707 N.W.2d 370, 374 (Minn. 2006))). Saltzstein also made mis-

representations to clients about the status of their cases or their funds, the latter to hide his misappropriation. *See In re Ulanowski*, 800 N.W.2d 785, 800 (Minn. 2011) (stating that "[s]evere discipline is warranted where a lawyer's conduct is dishonest and lacks integrity"). Finally, Saltzstein repeatedly failed to cooperate with the investigations into his misconduct. *See Nelson*, 733 N.W.2d at 464 ("[N]oncooperation with the disciplinary process . . . increases the severity of the disciplinary sanction.").

■ We next consider "the cumulative weight and severity of multiple disciplinary rule violations," which "may compel severe discipline even when a single act standing alone would not have warranted such discipline." *In re Oberhauser*, 679 N.W.2d 153, 160 (Minn. 2004). We distinguish between " 'a brief lapse in judgment' or 'a single, isolated incident' " and multiple instances of misconduct "occurring over a substantial amount of time." *In re Fairbairn*, 802 N.W.2d 734, 743 (Minn. 2011) (quoting *In re Wentzel*, 711 N.W.2d 516, 521 (Minn. 2006); *In re Rooney*, 709 N.W.2d 263, 268 (Minn. 2006)).

Saltzstein's array of misconduct spanned a lengthy period, affected numerous clients, and included various types of violations. The client-related misconduct cov-

**3.** The petition alleges that Saltzstein misappropriated funds from P.A. by selling the Yukon, which he had received as payment of attorney fees for P.A.'s appeal, and "retain[ing] the proceeds, even though he had failed to complete all the work on [P.A.'s] appeal." It is unclear whether these circumstances constitute the misappropriation of client funds. An attorney misappropriates client funds if he or she receives a retainer from a client, performs no work for the client, and does not return the funds to the client. *See In re Taplin*, 837 N.W.2d 306, 310-11 (Minn. 2013). The petition alleged that Saltz-

stein performed some work on P.A.'s appeal by filing a notice of appeal. *See id.* (concluding that an attorney did not misappropriate client funds because the attorney "performed at least *some* work on both client matters" and provided documentation showing that the unearned and unreturned portions of the client fees were held in trust). We need not decide whether Saltzstein's retention of the proceeds from the sale of the Yukon constitutes misappropriation of client funds because resolution of this issue would not affect the discipline in this case.

ered over 4 years, beginning in September 2011, when Saltzstein first withdrew additional funds from C.W.'s mutual-fund account, and ending in October 2015, when he cancelled meetings with M.O. and sold the Yukon without completing P.A.'s appeal. His failure to cooperate with the disciplinary process extended the time frame even further, into 2016. In addition, Saltzstein's misconduct covered six client matters and included a wide array of violations, including misappropriation of client funds, engaging in a pattern of neglect and failure to communicate with clients, entering into improper fee agreements with several clients, and failing to place clients' funds in trust and properly account for those funds. Because Saltzstein engaged in many instances of misconduct "over a substantial amount of time," the cumulative weight of his misconduct is substantial. *See id.*

■ The last two factors are harm to the public and to the legal profession. In evaluating harm to the public, we consider " 'the number of clients harmed [and] the extent of the clients' injuries.' " *In re Coleman*, 793 N.W.2d 296, 308 (Minn. 2011) (quoting *In re Randall*, 562 N.W.2d 679, 683 (Minn. 1997)). Saltzstein's misconduct unquestionably harmed his clients. C.W. lost money from his mutual-fund account and was required to sue Saltzstein to recover the money that belonged to him. Saltzstein misappropriated $38,635 from P.A., and P.A. lost the chance to appeal his conviction before the Eleventh Circuit after Saltzstein failed to file a brief. P.A. also lost the full value of his Yukon despite Saltzstein's failure to file a brief, and lost his court-ordered life-insurance policy due to the nonpayment of the premiums. N.K. forfeited an appeal of his parole revocation because of Saltzstein's failure to file a

brief. A court issued a warrant for M.O.'s arrest after Saltzstein failed to appear at a hearing, and she was charged $30,000 for a rehabilitation program recommended by Saltzstein, a charge that he promised, but failed, to "look into." Most of Saltzstein's clients also incurred expenses for substitute legal counsel as a result of Saltzstein's failure to adequately handle their cases and property.

The legal profession itself was harmed by Saltzstein's misconduct. "Misappropriation of client funds is a breach of trust that harms not only the affected client but also the public and the legal profession." *Matson*, 889 N.W.2d at 24. "By engaging in a pattern of client neglect, [Saltzstein] has undermined the public confidence in the legal profession, harming both the public and the profession itself." *In re Lundeen*, 811 N.W.2d 602, 609 (Minn. 2012). Finally, Saltzstein's "failure to cooperate with the disciplinary investigations harmed the legal profession by undermining the public's confidence in the ability of the profession to self-regulate." *Matson*, 889 N.W.2d at 24.

We also consider the existence of aggravating or mitigating factors. The Director does not contend that any aggravating factors are present. In a letter sent to the Director on August 29, 2016, Saltzstein alluded to various potential mitigating factors. Saltzstein, however, did not file an answer, which is the pleading in which an attorney should raise any mitigating factors. *See Matson*, 889 N.W.2d at 25 (declining to consider mitigating factors an attorney attempted to raise for the first time in a brief to this court because he did not include them in his answer to the petition for disciplinary action, and stating that "[t]he time for raising defenses under the rules is in the answer"); *see also In re*

*Schulte*, 869 N.W.2d 674, 679 (Minn. 2015); *In re Ladd*, 463 N.W.2d 281, 283 (Minn. 1990). Nor does the record contain any factual findings supporting any potential mitigating factors. *See In re Rymanowski*, 809 N.W.2d 217, 226 (Minn. 2012) (declining to consider possible mitigating factors that the attorney may have discussed with the Director when "there is nothing in the record to support our consideration of such a ... mitigating factor"). We therefore conclude that no mitigating factors are present in this case.

Finally, in determining the appropriate discipline, we refer to similar cases for guidance. *In re Kurzman*, 871 N.W.2d 753, 759 (Minn. 2015). We have disbarred attorneys who, like Saltzstein, misappropriated client funds and committed additional misconduct. *See, e.g.*, *Matson*, 889 N.W.2d at 19-22 (disbarring an attorney who misappropriated $550 from a client, made false statements to clients, fabricated a document, neglected and abandoned numerous clients, failed to abide by court rules, filed a frivolous motion, failed to place client funds in trust, failed to return unearned fees, used improper fee agreements, failed to cooperate with the investigation of several disciplinary complaints, and was suspended by the North Dakota Supreme Court); *In re Jones*, 834 N.W.2d 671, 673-74 (Minn. 2013) (disbarring an attorney who misappropriated between $51,142 and $73,000 from clients, failed to keep trust account books and records, and failed to cooperate with the Director); *Lundeen*, 811 N.W.2d at 608-09 (disbarring an attorney for misconduct that included misappropriation of $7,800 in client funds, failure to place client funds in a trust account, failure to return unearned fees, failure to appear for trial, making false statements to courts and clients, failure to comply with court orders, neglect of client matters, and fail-

ure to cooperate with the disciplinary process). Given our precedent, the totality of Saltzstein's misconduct, and the lack of mitigating factors, we conclude that the appropriate discipline for Saltzstein's misconduct is disbarment.

### CONCLUSION

Accordingly, Respondent Geoffrey R. Saltzstein is disbarred from the practice of law in the State of Minnesota, effective on the date of this opinion. Saltzstein shall comply with Rule 26, RLPR (requiring notice of disbarment to clients, opposing counsel, and tribunals), and shall pay $900 in costs under Rule 24(a), RLPR.

Disbarred.